**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John Lee McLaughlin,<br><br>   Plaintiff,<br><br>v.<br><br>Carolyn W. Colvin, Acting Commissioner of Social Security,<br><br>   Defendant. | No. CV-15-00745-PHX-NVW<br><br>**ORDER** |

Plaintiff John Lee McLaughlin seeks review under 42 U.S.C. § 405(g) of the final decision of the Commissioner of Social Security ("the Commissioner"), which denied him disability insurance benefits and supplemental security income under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act. Because the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence and is not based on legal error, the Commissioner's decision will be affirmed.

**I.    BACKGROUND**

Plaintiff was born in June 1973 and was 37 years old on the alleged disability onset date. He has at least a high school education and is able to communicate in English. He worked as a day laborer, a garbage truck driver, a dump truck driver, an ink mixer, and a convenience store clerk. He is 5'11" and weighs about 265-285 pounds.

Plaintiff suffered a lower back injury at work in 2004. He has not worked since 2007. In 2008, he had back surgery for a herniated disk at L5-S1 on the left. In 2010 Plaintiff reported pain and left radiculopathy, and an MRI showed some possible disk bulge at the surgery site and a midline herniated disk at L4-5 that was present several years before. In December 2010, Plaintiff's neurosurgeon found the MRI did not show any definitive nerve root compression at S1 despite reported symptoms that were consistent with a left S1 radiculopathy, and he recommended nerve blocks rather than surgery. Plaintiff did not have nerve blocks. In February 2011, Plaintiff reported to his primary care physician that he had been advised to have epidural injections, but he refused because his father had a bad experience and because he was concerned the injections could leave scars. In July 2011, Plaintiff's primary care physician prescribed a back brace with built-in electrodes and a TENS unit to treat Plaintiff's pain.

Plaintiff alleges constant back pain and numbness as well as nerve pain radiating down his left leg. To manage his pain, Plaintiff is prescribed Lyrica (nerve pain medicine), Soma (muscle relaxer), oxycodone (opioid pain medicine), and hydromorphone (opioid pain medicine). He testified the medication makes his pain tolerable and the only side effects he experiences are weight gain from the Lyrica and occasional insomnia from the hydromorphone. Medical records indicate Plaintiff has been taking opioid pain medicine since at least 2010.[1]

Plaintiff applied for disability insurance benefits on May 18, 2011, and for supplemental security income on April 5, 2013, alleging disability beginning April 28, 2011. On August 5, 2013, he appeared with his attorney and testified at a hearing before the ALJ. A vocational expert also testified. On September 17, 2013, the ALJ issued a decision that Plaintiff was not disabled within the meaning of the Social Security Act. The Appeals Council denied Plaintiff's request for review of the hearing decision,

---

[1] In December 2010 Plaintiff's neurosurgeon noted that Plaintiff "should be weaned from the large dose of narcotics he is currently taking."

making the ALJ's decision the Commissioner's final decision. On April 24, 2015, Plaintiff sought review by this Court.

## II. STANDARD OF REVIEW

The district court reviews only those issues raised by the party challenging the ALJ's decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). The court may set aside the Commissioner's disability determination only if the determination is not supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). Substantial evidence is more than a scintilla, less than a preponderance, and relevant evidence that a reasonable person might accept as adequate to support a conclusion considering the record as a whole. *Id.* In determining whether substantial evidence supports a decision, the court must consider the record as a whole and may not affirm simply by isolating a "specific quantum of supporting evidence." *Id.* As a general rule, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted); *accord Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) ("Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record."). "Overall, the standard of review is highly deferential." *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1002 (9th Cir. 2015).

## III. FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To determine whether a claimant is disabled for purposes of the Social Security Act, the ALJ follows a five-step process. 20 C.F.R. § 404.1520(a). The claimant bears the burden of proof on the first four steps, but the burden shifts to the Commissioner at step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the ALJ determines whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not

disabled and the inquiry ends. *Id.* At step two, the ALJ determines whether the claimant has a severe medically determinable physical or mental impairment. § 404.1520(a)(4)(ii). If not, the claimant is not disabled and the inquiry ends. *Id.* At step three, the ALJ considers whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Pt. 404. § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be disabled. *Id.* If not, the ALJ proceeds to step four. At step four, the ALJ assesses the claimant's residual functional capacity and determines whether the claimant is still capable of performing past relevant work. § 404.1520(a)(4)(iv). If so, the claimant is not disabled and the inquiry ends. *Id.* If not, the ALJ proceeds to the fifth and final step, where he determines whether the claimant can perform any other work based on the claimant's residual functional capacity, age, education, and work experience. § 404.1520(a)(4)(v). If so, the claimant is not disabled. *Id.* If not, the claimant is disabled. *Id.*

At step one, the ALJ found that Plaintiff meets the insured status requirements of the Social Security Act through December 30, 2012, and that he has not engaged in substantial gainful activity since April 28, 2011, the alleged onset date. At step two, the ALJ found that Plaintiff has the following severe impairments: degeneration of the lumbar spine intervertebral disk, obesity, and lumbar radiculitis. At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

At step four, the ALJ found that Plaintiff:

> has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following exceptions. The claimant cannot crawl, crouch, climb, squat, or kneel. The claimant cannot use the lower extremities for pushing/pulling and must have a sit/stand option, which would allow him to sit or stand alternatively at will provided that the claimant is not off task more than 10% of the work period.

The ALJ further found that Plaintiff is unable to perform any past relevant work. At step five, the ALJ concluded that, considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff could perform. Representative occupations include parking lot attendant, cashier, and ticket taking positions.

## IV. ANALYSIS

### A. The ALJ Provided Specific, Clear, and Convincing Reasons for Discrediting Plaintiff's Symptom Testimony.

If a claimant's statements about pain or other symptoms are not substantiated by objective medical evidence, the ALJ must consider all of the evidence in the case record, including any statement by the claimant and other persons, concerning the claimant's symptoms. SSR96-7p. Then the ALJ must make a finding on the credibility of the claimant's statements about symptoms and their functional effects. *Id.*

In evaluating the credibility of a claimant's testimony regarding subjective pain or other symptoms, the ALJ is required to engage in a two-step analysis: (1) determine whether the claimant presented objective medical evidence of an impairment that could reasonably be expected to produce some degree of the pain or other symptoms alleged; and, if so with no evidence of malingering, (2) reject the claimant's testimony about the severity of the symptoms only by giving specific, clear, and convincing reasons for the rejection. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).

To ensure meaningful review, the ALJ must specifically identify the testimony from a claimant the ALJ finds not to be credible and explain what evidence undermines the testimony. *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014). The ALJ must make findings "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

In making a credibility determination, an ALJ "may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully

corroborate the claimant's allegations." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009) (internal quotation marks and citation omitted).  But "an ALJ may weigh inconsistencies between the claimant's testimony and his or her conduct, daily activities, and work record, among other factors." *Id.*  The ALJ must consider all of the evidence presented, including the claimant's daily activities; the location, duration, frequency, and intensity of the pain or other symptoms; factors that precipitate and aggravate the symptoms; effectiveness and side effects of any medication taken to alleviate pain or other symptoms; treatment other than medication; any measures other than treatment the claimant uses to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  SSR 96-7p.

First, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms."  Second, the ALJ found Plaintiff's "statements regarding the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."

Plaintiff testified that he quit working because of excessive pain and that he is unable to work now because he is in constant pain.  He said the longest he can stand and walk is 15–20 minutes and the longest he can sit is 30–35 minutes.  He testified that on a typical day he gets up about 8:00 a.m., gets coffee, lies down for an hour or two, walks around for 15–20 minutes including going outside to smoke a cigarette, and then sits or lies back down.  He said he spends the rest of the day in a similar manner, lying down for about 8 hours a day while watching television.  Plaintiff also testified that on a typical day he experiences pain in his back and leg at a level of six on a scale of one to ten.

The ALJ found Plaintiff's claims of constant and excessive pain lacked credibility.  In addition to identifying objective medical evidence that does not support Plaintiff's claims, the ALJ identified specific evidence that Plaintiff's pain is successfully managed by medication.  The ALJ noted that Plaintiff testified he does not obtain treatment from a

pain clinic and his medications bring his pain to a "tolerable level." The ALJ noted treatment records showing Plaintiff's medications provided "good pain relief." Further, the ALJ found that Plaintiff's normal motor strength and lack of significant muscle atrophy were inconsistent with his reports of lying in bed and watching television or sleeping most of the time.[2] Therefore, the ALJ did not err in evaluating Plaintiff's credibility.

### B. The ALJ Did Not Err in Weighing a Third-Party Report.

Plaintiff contends that the ALJ committed legal error by giving little weight to a third-party report by Brenda McLaughlin, Plaintiff's mother. When an ALJ discounts the testimony of lay witnesses, he must give reasons that are germane to each witness. *Valentine v. Comm'r of Soc. Sec.*, 574 F.3d 685, 694 (9th Cir. 2009). When an ALJ has provided clear and convincing reasons for finding that a claimant's subjective complaints lack credibility, the ALJ may reject a third party's statement because it is similar to the claimant's allegations. *Id.*

The ALJ stated that the Third Party Function Report by Brenda McLaughlin, Plaintiff's mother, was given little weight because "it essentially mirrors the claimant's subjective allegations." That is a reason germane to this witness.

### C. The ALJ Did Not Err in Weighing Medical Source Opinion Evidence.

#### 1. Legal Standard

Generally, more weight should be given to the opinion of a treating physician than to the opinions of physicians who do not treat the claimant, and the weight afforded a non-examining physician's opinion depends on the extent to which he provides supporting explanations for his opinions. *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014). Where a treating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons, and where it is

---

[2] The ALJ did not find Plaintiff's activities of daily living were inconsistent with his claims of constant and excessive pain.

- 7 -

contradicted, it may not be rejected without "specific and legitimate reasons" supported by substantial evidence in the record. *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007).

In deciding the weight to give any medical opinion, the ALJ considers not only whether the source has a treating or examining relationship with the claimant, but also whether the treatment or examination is related to the alleged disability, the length of the relationship, frequency of examination, supporting evidence provided by the source, and medical specialization of the source. 20 C.F.R. § 404.1527(c). Generally, more weight is given to the opinion of a specialist about medical issues related to his area of specialty than to the opinion of a source who is not a specialist. 20 C.F.R. § 404.1527(c)(5). The ALJ may discount a physician's opinion that is based only the claimant's subjective complaints without objective evidence. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004). The opinion of any physician, including that of a treating physician, need not be accepted "if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009). An ALJ may reject standardized, check-the-box forms that do not contain any explanation of the bases for conclusions. *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

### 2. Treating Primary Care Physician Stacia Kagie, D.O.

The record includes three functional assessments dated February 2011, July 2011, and May 2013, on check-the-box forms completed by Dr. Kagie. In February 2011 and May 2013, Dr. Kagie identified Plaintiff's impairment/diagnosis as left lumbar radiculopathy. In July 2011, she identified it as back pain and lumbar degenerative disk disease.

In both 2011 assessments, Dr. Kagie opined that in an eight-hour work day Plaintiff could sit less than two hours and stand/walk less than two hours. On both forms she said she had not tested his ability to lift and carry. In February 2011, Dr. Kagie said that Plaintiff suffered from moderate fatigue and memory impairment from Lyrica and

Percocet;³ in July 2011, she said he suffered from mild fatigue as a medication side effect. Regarding other symptoms that limit Plaintiff's ability to work, Dr. Kagie said moderately severe "pain, fatigue, unsteadiness" in February 2011 and moderate "pain, fatigue" in July 2011.

In her 2013 assessment, Dr. Kagie did not check any boxes regarding Plaintiff's capacity to sit, stand/walk, lift, or carry, but merely wrote "same." She also wrote "same" for additional limitations and medication side effects. The form used in 2013 asked whether the patient would need to alternate between sitting, standing, and walking. Dr. Kagie opined that Plaintiff should alternate positions every 21-45 minutes with 5-9 minutes of rest with each position change. The 2013 form also asked whether the patient would miss time from work due to his medical condition. Dr. Kagie opined that Plaintiff would miss six or more days per month due to his medical condition.

The ALJ gave Dr. Kagie's opinions little weight for three reasons: (1) they were inconsistent with the overall objective medical record including Dr. Kagie's own reports, (2) the assessments were "simply check sheets" without explanation, and (3) Dr. Kagie was Plaintiff's primary care physician, not a specialist. The ALJ was required to consider Dr. Kagie's opinions because she had a treating relationship with Plaintiff, but the ALJ was entitled to take into account her medical specialization. *See* 20 C.F.R. § 404.1527(c). Moreover, the ALJ need not accept any opinion that is brief, conclusory, and inadequately supported by clinical findings. *Bray*, 554 F.3d at 1228. Dr. Kagie's opinions were brief and conclusory on their face, and Dr. Kagie did not identify any supporting clinical findings.

Regarding the overall objective medical record, Plaintiff contends the ALJ improperly "cherry picked" from mixed medical evidence, but the evidence Plaintiff contends the ALJ should have cited does not demonstrate that Plaintiff's medical

---

³ Percocet is a combination of acetaminophen and oxycodone.

impairment prevents him from sitting or standing/walking more than a total of four hours a day. Plaintiff contends the ALJ should have relied on the September 2010 MRI results instead of x-ray results, but the MRI showed only mild impairment at L4-5. When Plaintiff's neurosurgeon reviewed the MRI results, he concluded the S1 nerve root was not compromised and the L4-5 impairment had not changed from several years before. Most of what Plaintiff relies on is not objective medical evidence, but rather documentation that Plaintiff reported chronic lower back pain and was prescribed large amounts of narcotic pain medications for years.

Dr. Kagie's own treatment reports rely primarily on Plaintiff's subjective reports, stating that his chronic lower back pain is usually well managed with a TENS unit, Lyrica, and oxycodone, without side effects or worsening symptoms, and with hydromorphone for occasional flares or spasms. In August 2010 Dr. Kagie noted that Plaintiff's back pain was characterized as a dull ache in the lumbosacral area, it did not radiate, and Plaintiff continued to be "very stable with current pain mgt treatment of percocet, soma, and lyrica." Plaintiff reported that he could sit for one hour before needing to change position. Dr. Kagie's physical examination revealed normal gait and posture. There were no musculoskeletal findings.

Dr. Kagie's treatment report in September 2010 repeated that Plaintiff's back pain was a dull ache in the lumbosacral area and did not radiate. Dr. Kagie noted that Plaintiff reported he developed sudden pain and was taken to ER by ambulance the night before. He was treated with hydromorphone and valium and sent home. He requested that Dr. Kagie order an MRI and increase his pain medication. She ordered the MRI and prescribed hydromorphone for "break through" pain in addition to his regular oxycodone dosing schedule. Dr. Kagie noted his gait as antalgic, slow, and cautious. She observed tenderness over the lumbar vertebra at the site of his previous surgery.

Dr. Kagie's next treatment report in the record is dated February 2011. Plaintiff's back pain is described the same as before, but with the additional comment that

occasionally he has radiating pain down his left leg, which is significantly improved by taking Lyrica twice a day. Dr. Kagie also noted Plaintiff had been taking oxycodone 3-4 times a day and would alternate it with the hydromorphone, and "he has had good pain relief." Physical examination findings included normal posture and antalgic gait. There were no musculoskeletal findings.

In May 2011, Dr. Kagie noted that Plaintiff reported he had been taking oxycodone 3-4 times a day, had stopped taking hydromorphone, and "continues to have good pain relief." He reported occasional pain radiating down his left leg and "it is significantly improved with the Lyrica." Physical examination findings included normal posture and normal gait. There were no musculoskeletal findings.

In July 2011, Dr. Kagie noted that Plaintiff reported he had been taking oxycodone 3-4 times a day and had stopped the hydromorphone, but then started taking it again after a recent flare. He reported being seen in the ER due to his extreme pain where he was treated with a muscle relaxer. Physical examination findings included normal posture and gait, tenderness over lumbar vertebra, and painful flexion and extension.

In August 2011, Plaintiff saw a nurse practitioner for medication refills. He reported that his low back pain had been improving and that using the TENS unit was helping significantly.

On November 2, 2011, Plaintiff presented for medication management. Dr. Kagie noted that Plaintiff had a history of chronic low back pain and was stable with his TENS unit and medications. She also noted that he had not needed to take hydromorphone because his back pain had been stable. There were no physical examination findings. On November 15, 2011, Plaintiff returned to Dr. Kagie for an apparent dental infection.

In January 2012, Plaintiff received prescriptions for refills of medications, including hydromorphone and oxycodone. Dr. Kagie noted Plaintiff was stable with his TENS unit and medications, without side effects or worsening symptoms. She said he

had not needed to take hydromorphone because his back pain had been stable, but he did use it intermittently with his dental pain. There were no physical examination findings.

In April 2012, Plaintiff received prescriptions for refills of medications, including hydromorphone and oxycodone. Dr. Kagie noted Plaintiff was stable with his TENS unit and medications, without side effects or worsening symptoms. She noted that Plaintiff continued to take hydromorphone only as needed because his back pain had been stable, but occasionally flared up. He recently reached too high to install a bird feeder at home and his back went into spasm. There were no physical examination findings.

In July 2012, Plaintiff received prescriptions for refills of medications, including hydromorphone and oxycodone. Dr. Kagie noted Plaintiff was stable with his TENS unit and medications, without side effects or worsening symptoms. She noted that Plaintiff continued to take hydromorphone only as needed, but he recognized when his pain may flare up and would take hydromorphone for several days to prevent having several weeks of pain. Upon physical examination, Dr. Kagie observed tenderness to palpation at left iliolumbar ligaments.

In October 2012, Plaintiff's pain medications were refilled, and Dr. Kagie's physical examination did not refer to Plaintiff's back or legs. Dr. Kagie noted Plaintiff was stable with his TENS unit and medications, without side effects or worsening symptoms. She noted that Plaintiff takes the hydromorphone as needed, but he had needed it more frequently for dental pain. She noted that Plaintiff is unable to afford dental care, is waiting for his Social Security disability hearing, and then should be able to afford dental care.

In December 2012, Plaintiff received prescriptions for refills of medications, including hydromorphone and oxycodone. Dr. Kagie noted that Plaintiff takes his medications as prescribed without side effects or worsening symptoms. She noted that Plaintiff takes the hydromorphone as needed, he had taken one that morning, and he had taken it several times the past week. Under "musculoskeletal," Dr. Kagie said, "Patient

reports arthritis." Dr. Kagie's physical examination did not refer to Plaintiff's back or legs.

On March 26, 2013, Plaintiff did not show for his appointment. In April 2013, Plaintiff received prescriptions for refills of medications, including hydromorphone and oxycodone. Dr. Kagie noted Plaintiff had been having "some increasing body aches recently but feels like his left leg numbness has been stable (but he does run into things recurrently since he doesn't feel it/sense it)." Dr. Kagie's physical examination findings included: lower extremity muscle strength 5/5 on all of the right side, 4/5 on the left hips and knees, and 3+/5 on the left foot. She also found Plaintiff had decreased sensation to light touch in his left lateral leg and foot.

Dr. Kagie's treatment records show only that for three years she prescribed pain medication and Plaintiff continued to report that the pain medication kept his pain level stable without side effects or worsening symptoms. Dr. Kagie did not assess Plaintiff's functional capacity and made almost no physical examination findings. The ALJ gave three clear and convincing reasons for giving Dr. Kagie's opinions little weight, and those reasons are supported by substantial evidence.

### D. The ALJ Did Not Err in Determining Plaintiff's Residual Functional Capacity.

The ALJ determined that Plaintiff has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except no crawling, crouching, climbing, squatting, kneeling, or pushing/pulling with the lower extremities. The ALJ also determined that Plaintiff must have a sit/stand option that allows him to sit or stand alternatively at will, provided he is not off task more than 10% of the work period. Plaintiff contends the ALJ's residual functional capacity assessment is based on legal error and/or not supported by substantial evidence because no medical source opined that Plaintiff can perform light work. But Plaintiff cites no authority for this contention.

A residual functional capacity finding involves a detailed assessment of how a claimant's medical impairments affect his ability to work. In determining a claimant's residual functional capacity, the ALJ "must consider all relevant evidence in the record, including, inter alia, medical records, lay evidence, and 'the effects of all symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. SSA*, 466 F.3d 880, 883 (9th Cir. 2006). The evidence that a claimant submits or the Commissioner obtains *may* contain medical opinions. 20 C.F.R. § 404.1527(a)(2). The ALJ must evaluate any medical opinion submitted and consider certain factors in deciding how much weight to give it. 20 C.F.R. § 404.1527(c). But the ALJ considers medical opinions together with the rest of the relevant evidence submitted. 20 C.F.R. § 404.1527(b).

Plaintiff also contends the ALJ erred by failing to identify the specific limitations opined to by the treating source and State agency consultants that she rejected and cite to evidence conflicting with the medical opinions. As discussed above, Dr. Kagie gave no opinion regarding Plaintiff's capacity to lift and carry and no explanation for her opinion that Plaintiff can sit less than 2 hours and stand/walk less than 2 hours in an eight-hour day. In July 2011, Dr. Kagie opined that in an eight-hour day Plaintiff can use both hands continuously and both feet frequently. She opined that he can bend, stoop, balance, and kneel occasionally and never crawl, climb, or crouch. In 2013, Dr. Kagie also opined that Plaintiff requires a sit/stand option. Thus, the ALJ adopted some limitations equal to or greater than those opined to by Dr. Kagie. The ALJ stated specific reasons for rejecting Dr. Kagie's opinion that Plaintiff can sit less than 2 hours and stand/walk less than 2 hours, i.e., it is inconsistent with the overall objective medical record including Dr. Kagie's own reports and Dr. Kagie's assessments do not include an explanation of Plaintiff's medical condition.

Two State agency medical consultants reviewed Plaintiff's file and opined that Plaintiff is capable of performing sedentary work, sitting for a total of six hours with

normal breaks and standing and/or walking for two hours with normal breaks. They did not opine that Plaintiff required a sit/stand option. They opined Plaintiff had no limitation for pushing and pulling with hands or feet. They opined that Plaintiff was limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling. They found the MRI and x-rays of the lumbar spine to be "fairly normal" and in 2012 no current evidence of radiculopathy. They did not provide any explanation for their conclusion that Plaintiff is limited to sedentary work. The ALJ's residual functional capacity assessment includes greater postural limitations than do the opinions of the State agency medical consultants, but does not limit Plaintiff to sedentary work.

The ALJ gave little weight to the opinions of the State agency medical consultants because Plaintiff's spine study revealed "minimal disc space narrowing at L4-L5" and medical reports revealed Plaintiff's back pain was stable with medications and TENS therapy. Plaintiff correctly states the spine study shows more than disk narrowing, but most of what it shows is "unremarkable" or "mild." In fact, when Plaintiff's neurosurgeon reviewed the spine study, he found it did not show any definitive nerve root compression at S1 despite reported symptoms that were consistent with a left S1 radiculopathy.

Finally, Plaintiff contends the ALJ erred by presuming Plaintiff's need for position changes would not result in him being off task more than 10% of the work day. The ALJ did not presume how long Plaintiff would be off task between sitting and standing. Rather, in her credibility finding and weighing of medical source evidence, the ALJ determined that Plaintiff did not need to lie down as much as he claimed or rest as often and for as long as Dr. Kagie opined. The ALJ concluded Plaintiff did not need to rest more than 10% of the work day.

The ALJ's residual functional capacity assessment is supported by substantial evidence and is not based on legal error.

IT IS THEREFORE ORDERED that the final decision of the Commissioner of Social Security is affirmed.  The Clerk shall enter judgment accordingly and shall terminate this case.

Dated this 4th day of May, 2016.

*[signature]*
Neil V. Wake
United States District Judge